IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ANDREW AND EUNICE BOGER, | § | |
| AS TRUSTEE OF BOGER | § | |
| FAMILY TRUST, *ET AL.,* | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CASE NO. 5:24-CV-00851-OLG |
| | § | |
| PINE GATE RENEWABLES, LLC AND | § | |
| RIO LAGO SOLAR, LLC, | § | |
| Defendants. | § | |

## PLAINTIFFS' SIXTH AMENDED COMPLAINT

TO THE HONORABLE MAGISTRATE RICHARD B. FERRER:

COME NOW Plaintiffs ANDREW AND EUNICE BOGER, AS TRUSTEES OF BOGER FAMILY TRUST, JULIE A. MILLS, PATTI LYNN WIATREK f/k/a PATTI LYNN BROWN, O'BANYON WOOTSEN CUSTER AND NATALIE CHRISTINE CUSTER, BRYAN NEFF AND LAURIE NEFF, LORETTA NEUMANN, NEVELS PROPERTIES, LLC, AND LUKE SCHILHAB AND ALLISON SCHILHAB (collectively referred to herein as "PLAINTIFFS") and file this *Plaintiffs' Sixth Amended Complaint* against Defendants PINE GATE RENEWABLES, LLC and RIO LAGO SOLAR, LLC, respectfully showing unto the Court as follows:

### I.
### PARTIES

1.     Plaintiffs ANDREW BOGER and EUNICE BOGER are the trustees of BOGER FAMILY TRUST. BOGER FAMILY TRUST owns two tracts of real property containing approximately eighty acres and identified jointly for purposes of this lawsuit as 2021 FM 3240, Bandera, Texas 78003, herein referred to as "BOGER PROPERTY."

2. Plaintiff JULIE A. MILLS is a resident of Bandera County, Texas. Plaintiff JULIE A. MILLS owns four tracts of real property containing approximately 14.7 acres, identified jointly for purposes of this lawsuit as 1141 FM 3240, Bandera, Texas 78003, herein referred to as "MILLS PROPERTIES."

3. Plaintiff PATTI LYNN WIATREK F/K/A PATTI LYNN BROWN is a resident of Bandera County, Texas. Plaintiff PATTI LYNN WIATREK F/K/A PATTI LYNN BROWN owns one tract of real property containing approximately twenty-two acres identified as 2221 FM 3240, Bandera, Texas 78003, herein referred to as "BROWN PROPERTY."

4. Plaintiffs O'BANYON WOOTSEN CUSTER AND NATALIE CHRISTINE CUSTER are residents of Bandera County, Texas. Plaintiffs O'BANYON WOOTSEN CUSTER AND NATALIE CHRISTINE CUSTER own one tract of real property containing approximately 110 acres identified as 1567 FM 3240, Bandera, Texas 78003, herein referred to as "CUSTER PROPERTY."

5. Plaintiffs BRYAN NEFF AND LAURIE NEFF are residents of Bandera County, Texas. Plaintiffs BRYAN NEFF AND LAURIE NEFF own three tracts of real property identified as 1) ABST 1 HOLLY ARNOLD SVY 61 TR 39 80.57 ACRES, 2) ABST 4 HENDRICK ARNOLD SVY 60 TR 105 289.08 ACRES, and 3) ABST 4 HENDRICK ARNOLD SVY 60 TR 1099 2 ACRES, herein referred to as "NEFF PROPERTIES."

6. Plaintiff LORETTA NEUMANN is a resident of Bandera County, Texas. Plaintiff LORETTA NEUMANN owns two tracts of real property containing approximately forty-seven acres, identified jointly for purposes of this lawsuit as 1825 FM 3240, Bandera, Texas 78003, herein referred to as "NEUMANN PROPERTIES."

7. Plaintiff NEVELS PROPERTIES, LLC is a Texas limited liability company with its principal place of business in Bandera County, Texas. Plaintiff NEVELS PROPERTIES, LLC owns one

tract of real property containing approximately fifteen acres identified as 2632 FM 3240, Bandera, Texas 78003, herein referred to as "NEVELS PROPERTY."

8.      Plaintiffs LUKE SCHILHAB AND ALLISON SCHILHAB are residents of Bandera County, Texas. Plaintiffs LUKE SCHILHAB AND ALLISON SCHILHAB own two tracts of real property containing approximately twenty-four acres, jointly identified for purposes of this lawsuit as 2307 FM 3240, Bandera, Texas, 78003, herein referred to as "SCHILHAB PROPERTIES."

9.      Defendant PINE GATE RENEWABLES, LLC is a limited liability company with its principal place of business in North Carolina.  PINE GATE RENEWABLES, LLC represented in its Notice of Removal that its constituent members are domiciled outside the State of Texas.

10.      Defendant RIO LAGO SOLAR, LLC is a limited liability company with its principal place of business in Texas. RIO LAGO SOLAR, LLC's represented in its Notice of Removal that its constituent members are domiciled outside the State of Texas.

## II.
## JURISDICTION

11.      This Court has jurisdiction under 28 U.S.C. section § 1332(a)(i) because Plaintiffs and Defendants are citizens of different United States and the amount in controversy exceeds $75,000.00.

## III.
## VENUE

12.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the property at issue is situated in this District.

## IV.
## INTRODUCTION

13.      PINE GATE RENEWABLES, LLC and RIO LAGO SOLAR, LLC (collectively referred to herein as "PINE GATE") are utility-scale renewable energy companies which engage in the construction of solar sites.  PINE GATE plans to construct a solar energy generating facility or solar farm (the "Rio Lago Solar Project") on four agricultural properties in Bandera County, Texas

identified as the Shaw Property, Cox Property, Heep Property, and Mazurek Property (referred to herein as the "Leased Properties").

14.     PLAINTIFFS own land adjacent to or near the Leased Properties.   The Leased Properties encompass approximately twenty-seven hundred acres.

## V.
### BACKGROUND

### A.     Rio Lago Solar Project Located in Area *Extremely* Susceptible to Stormwater Runoff and Soil Erosion

15.     Bandera County's significant amount of karst terrain makes the soils more susceptible to the effects of rainfall.  The removal of vegetation reduces the capacity of the vegetated surface to absorb and transpire rainfall.  Cleared land is more prone to soil saturation because of reduced transpiration. When soil is saturated, surface runoff increases. The increased water velocity resulting from PINE GATE clearing the land coupled with the sediment disturbance which PINE GATE has caused and will continue to cause significant amounts of sediment to flow into Mud Creek, Doe Creek, the Medina River, and associated tributaries.

### A.     Plaintiffs Obtain Injunctive Relief

16.     As the start of construction neared, PINE GATE rebuffed all attempts by PLAINTIFFS to discuss PLAINTIFFS' concerns regarding the potential effects to the downstream properties caused by stormwater runoff and sediment erosion.

### *1.     Temporary Restraining Order*

17.     On December 27, 2023, PLAINTIFFS obtained a Temporary Restraining Order preventing any construction activities on the Rio Lago Solar Project site.  The Temporary Injunction hearing was set for January 9, 2024 before the Honorable Patrick Maguire, 198th Judicial District Court, Bandera County, Texas (hereinafter "State Trial Court").  The State Trial Court reset the hearing to January 29, 2024 to allow PLAINTIFFS and PINE GATE to exchange extensive discovery

and conduct fifteen depositions, including the depositions of eight parties, three PINE GATE employees/representatives, two plaintiffs' experts, one defendant expert, and Kimley-Horn project engineer Colton Morgan.

     *2.*     *Temporary Injunction*

18.     The testimony at the Temporary Injunction hearing established PINE GATE's construction timeline was tied to a $11.9 million interconnection agreement between Bandera Electric Cooperative and Electric Reliability Council of Texas (ERCOT) which required full connection between Rio Lago Solar and ERCOT by December 2025. In January of 2024, PINE GATE's greatest hurdle to successfully meeting ERCOT deadlines was the Endanger Species Act.

19.     In January 2024, PINE GATE's greatest hurdle to successfully meeting the deadline was the Endangered Species Act which prohibited noisy construction or removal of trees in designated areas during the Golden Cheeked Warbler nesting season which lasted from mid-March to early summer. Because a portion of the Rio Lago Solar Project was located within the protected area, a unique and complicated timing issue arose as a result of the moratorium imposed by the Endangered Species Act because PINE GATE needed to clear the land to begin construction.

20.     PINE GATE's ability to meet the December 2025 deadline was further exacerbated by PINE GATE's lack of completed engineering plans or construction plans. In an effort to remain on schedule, PINE GATE proposed to the State Trial Court the option to utilize a Pre-Construction Phase 1 Tree Felling Plans to clear the trees prior to mid-March. Kimley-Horn's engineer explained the engineered plans were "extremely sensitive to any impacts" to offsite drainage, increased peak runoff, or sediment. During the hearing, Pine Gate proposed an "interim" plan including, inter alia: (1) a detailed tree felling plan; (2) a final Phase I tree felling SWPPP covering only the tree felling phase; (3) Silt fencing in affecting areas; and (4) meeting with county engineer to review the plans.

21.     By agreeing to limit the site preparation to "above ground tree felling," PINE GATE hoped to clear the site without the Issued for Construction (IFC) Plans or permits which are typically required before the clearing of property.

*22.*     On February 7, 2024, the State Trial Court entered a Temporary Injunction enjoining PINE GATE "from timbering or felling trees on the leased properties, along with other activities related to clearing, grading, or preparing the land in preparation for the solar farm" absent PINE GATE's compliance with specific requirements.  The State Trial Court required, inter alia, PINE GATE to: (1) prepare and implement a SWPPP prior to undertaking any soil-disturbing activities, (2) prepare and implement further SWPPPs prior to commencing each successive phase of the project, and (3) comply with all local, state, and federal laws.  *See* **Exhibit A**.

*3.*     *PINE GATE's Initial Permit Application to TQEQ Intentionally Deceptive*

23.     Unbeknownst the to the parties, and never addressed during the temporary injunction hearing, on or about January 16, 2024—thirteen days *before* the Temporary Injunction Hearing—PINE GATE submitted a **sworn** application for a construction permit with the Texas Commission on Environmental Quality ("TCEQ").  Contrary to the January 29th testimony that no engineering plans were yet complete, the January 16th application included a PINE GATE certification the necessary engineering plans were completed and in PINE GATE's possession.

## C.     Phase 1 Plan Above Ground Tree Felling Begins on the Rio Lago Solar Project

24.     On or about February 13, 2024, PINE GATE filed its Notice of TCEQ Construction Permit, SW3P, & Development which included Kimley-Horn's Phase 1 Above Ground Tree Felling Plan (the "Phase 1 Plan").  The Phase 1 Plan identified the requisite stormwater prevention measures with which PINE GATE was required to comply to safely proceed with the felling of trees.

> THE INTENT OF THE ABOVE GROUND TREE FELLING ACTIVITIES SHOWN IN THESE PLANS IS TO REMOVE ABOVE GROUND TREES AND SHRUBS WHILE KEEPING THE SOIL DISTURBANCE TO A MINIMUM DURING THESE ACTIVITIES. WHILE SIGNIFICANT SOIL DISTURBANCE IS NOT ANTICIPATED DURING THESE ACTIVITIES, CONTRACTOR TO FOLLOW THE BELOW NOTES AND REQUIREMENTS, IN ACCORDANCE WITH THE PHASE 1 ABOVE GROUND TREE FELLING STORMWATER POLLUTION PREVENTION PLAN (SWPPP) DURING ACTIVITIES ONSITE.

25.     Because the Phase 1 Plan was designed only for "above ground tree felling," the stormwater prevention measures specified by Kimley-Horn were **NOT** designed to prevent sediment erosion from areas with significant ground disturbance.  More specifically, the hydrology modeling used in designing the Phase 1 Plan was based on an Existing Conditions Hydrology Study addressing conditions *prior to any action taken* at the Rio Lago Solar Project and prior to any soil disturbance on the property.  In comparison, Kimley-Horn could not prepare the IFC Plans—which are still in development—without a more extensive Proposed Conditions Hydrology Report addressing the water drainage areas and any potential impact construction activities could have on stormwater runoff velocities, scour, and erosion rates.  Additionally, as the development of the plans and the project progressed, *but before engaging in construction activities*, Kimley-Horn would create ongoing hydrology modeling enabling the engineers to ensure the proper sediment control measures would protect the downstream properties.

26.     In recognition that the limited stormwater protections included in the Phase 1 Plan were based on soil *not being disturbed*, PINE GATE represented to the State Trial Court that very light equipment would be used in felling the trees, thereby avoiding significant changes to the ground cover.  Specifically, PINE GATE testified chainsaws would be used to fell the trees and brush would be carefully removed to ensure soil was not disturbed.  PINE GATE further represented construction would: (1) demobilize after the felling of the trees until after the Golden-Cheeked Warbler's nesting season ended on June 1, 2024; and (2) remobilize only after the construction plans were complete and all necessary permits were obtained.

**D.      PINE GATE Immediately Violates the Temporary Injunction**

*1.      Pine Gate Failed to Properly Install Construction Entrance*

*27.*      The Phase 1 Plan included a stabilized construction entrance designed by Kimley-Horn which only allowed PINE GATE to "disturb[] the area needed to install the entrance."   Over PLAINTIFFS' continuous objections, PINE GATE failed to install the construction entrance in accordance with the Phase 1 Plan.  The Phase 1 Plan's design provided for the construction entrance as a last level of defense to capture sediment leaving the Rio Lago Solar Project jobsite.

*2.      Pine Gate Failed to Install Silt Fencing as Directed by Kimley-Horn*

*28.*      Additionally, based on the Existing Conditions Hydrology Studies, PINE GATE knew or should have known:

a.      the location of the site construction entrance was at the lowest elevation on the property;

b.      the water naturally flowed to the exact location of the site construction entrance;

c.      the water continues flowing to the lowest elevation and in the direction of the flow of water;

d.      the implemented sediment control measures did not include all of the protective measures designed in the Phase 1 Plan;

e.      Without all of the sediment control measures, the implemented sediment control measures forced all of the disturbed soil to the Shaw construction entrance thereby mixing the contaminated water with the natural clean water flow; and

f.      the natural water flow would, now contaminated with the sediment leaving the Rio Lago Solar Project, then flow through the improperly constructed construction entrance and travel directly into the water tanks on the BOGER FAMILY TRUST property.

*29.*      Contrary to the Phase 1 Plans developed by Kimley-Horn, PINE GATE failed and refused to install silt fencing along the existing construction entrance, thereby providing a pathway for disturbed sediment to leave the Rio Lago Solar Project.  The Phase 1 Plans accounted for

proposed tree felling and installation of silt fencing.  Yet, PINE GATE ignored PLAINTIFFS' numerous

objections and refused to install the silt fencing as designed.



30.     PINE GATE's failure to install the proper sediment control measures on the jobsite,

in conjunction with the improper construction entrance, allowed displaced soil to pour into the clean

natural water flow and contaminate the downstream properties.

*3.     Pine Gate's Tree Removal Caused Significant Soil Disturbance*

31.     Throughout the month of February 2024, and in direct conflict with testimony on

January 29th, PINE GATE utilized excavators and other heavy equipment to knock down the trees

which clearly disturbed the soil.  In doing so, PINE GATE knowingly disregarded the Phase 1 Plan

specifically designed for no or minimal soil disturbance.  More specifically, PINE GATE knew or

should have known the silt fencing would be ineffective to control sediment runoff and was not

designed to filter the sediment disturbance caused by PINE GATE's felling the trees.

32.     Knowing significant soil disturbance on the Rio Lago Solar Project, PINE GATE failed

to install the minimal silt fencing as designed by Kimley-Horn.  In addition to failing to install the silt

fencing Kimley-Horn designed to protect the construction entrance, Pine Gate decided—without

consulting Kimley-Horn—to install silt fencing further channeling the water towards the

construction entrance.  PINE GATE knew their actions were (1) causing significant soil disturbance in

drainage areas exceeding two acres and (2) creating an increased risk of imminent danger for stormwater to cause sediment to flow onto and across the PLAINTIFFS' properties.

**F.      State Trial Court Enters Enforcement Order**

33.      On March 27, 2024, the State Trial Court held a hearing on Plaintiffs' Motion to Enforce the Temporary Injunction.  In direct conflict with Morgan's prior testimony, photographs offered before the trial court depicted excavators pulling trees and root balls from the property.  A PINE GATE representative opined the chainsaws were too dangerous and that PINE GATE elected to use an excavator with a mulching attachment to "delimb the trees."  The PINE GATE representative further testified the activities were creating "very minimal disturbance."

34.      On February 3, 2024, the State Trial Court entered findings that PINE GATE engaged in soil-disturbing activities in violation of the Temporary Injunction.  *See* **Exhibit B**.  The State Trial Court ordered monetary sanctions, but abated the imposition of the sanction provided PINE GATE fully complied with the following conditions: (1) PINE GATE allowed Plaintiffs' expert, Alan Stanton, access to the Leased Properties at all reasonable times to inspect the implementation of any and all SWPPPs; (2) PINE GATE did not further violate any existing or future SWPPP; and (3) PINE GATE did not further violate the Temporary Injunction Order. *See id.*

**VI.**
**PINE GATE VIOLATES SETTLEMENT AGREEMENTS**

**A.      Mediation Agreement**

35.      On April 4, 2024, PLAINTIFFS and PINE GATE participated in a court-ordered mediation.  During the course of the mediation, the parties conceptualized a dispute resolution procedure in which: (1) a Monitor would review the plans, permits, and actions of PINE GATE and make recommendations regarding acts PINE GATE should not take or continue and proactive steps PINE GATE should take or implement; and (2) any disagreement with the Monitor's recommendations

would be appealed to a three-engineer Review Panel.  The parties then began negotiating a final settlement agreement incorporating the concept.

**B.      PINE GATE Violates the Settlement Agreement**

36.      During the negotiation of the Settlement Agreement, PINE GATE repeatedly represented PINE GATE would: (1) fully disclose all construction information, reports, and plans to both PLAINTIFFS and the Monitor; and (2) comply with the dispute resolution process by submitting any disagreements with the Monitor's recommendations to the Review Panel.  Contrary to these representations, PINE GATE immediately took action to circumvent the process.

*1.      PINE GATE Attempted to Implement a Burn Plan without Notice to Plaintiffs*

37.      While the Settlement Agreement was still being negotiated, on or about April 30, 2024, PLAINTIFFS learned from third parties that PINE GATE was planning to burn the felled trees and brush on the Leased Properties based on a plan designed by the general contractor and ***not*** by Kimley-Horn civil engineers.  More importantly, the plan design included the digging of ten burn pits—each at a depth of six to eight inches and with a diameter of fifty feet pits—which undeniably would cause significant soil disturbance.  PINE GATE denied each of PLAINTIFFS' multiple requests for the hydrology studies required to determine the effect of the additional soil disturbance.

*2.      PINE GATE Denies Access to the Leased Properties*

38.      After PLAINTIFFS received the information regarding PINE GATE's burn plan, PLAINTIFFS requested that their expert be allowed access to the Leased Properties to review the burn pit locations and the potential effect of sediment entering the stormwater runoff.  Although the April 3, 2024 Enforcement Order provided PLAINTIFFS' expert the right to inspect the property at all reasonable time, only one day after the parties executed the Settlement Agreement, PINE GATE refused to allow PLAINTIFFS' expert timely access.  Ironically, during the three workdays PLAINTIFFS' expert was prevented from accessing the property, PINE GATE continued moving the felled trees and

brush using heavy equipment.  In a feeble attempt to conceal its actions, PLAINTIFFS witnessed PINE GATE moving the heavy equipment to the front of the project site two hours before PLAINTIFFS' expert was given access.  Despite PINE GATE's blatant attempts to cover up its violations of the Phase 1 Plan, PLAINTIFFS' expert documented significant soil disturbance and the lack of proper sediment control measures.

**C.**   **PINE GATE Violates Rule 11 Agreement**

39.     After PINE GATE violated the Settlement Agreement, PLAINTIFFS continued to attempt to work through their concerns with PINE GATE regarding the necessary environmental protections.  After further negotiation, the parties entered into a Rule 11 Agreement on May 7, 2024, to supplement and modify the Settlement Agreement.  The Rule 11 Agreement provided for PLAINTIFFS' expert and Kimley-Horn's engineer to meet at the property and jointly determine and agree upon a Plan of Action to address the soil disturbance concerns.

40.     At the January 29th Temporary Injunction Hearing, Kimley-Horn's engineer testified that as the existing ground cover changed on the project, Kimley-Horn would run interim hydrology studies and modeling to ensure, at each stage, "no off-site impacts from that drainage."  Prior to the meeting, and *without having seen the project site after the trees were felled*, Kimley-Horn's engineer opined the Burn Plan would not result in significant soil disturbance.  During the meeting on May 9, 2024, Kimley-Horn's engineer expressed surprise the amount of soil-disturbance and consistent with his prior testimony agreed hydrology studies were warranted.

41.     As contemplated in the Rule 11 Agreement, Kimley-Horn's engineer and PLAINTIFFS' expert agreed upon a Plan of Action in which Kimley-Horn would conduct additional hydrology modeling for the Rio Lago Solar Project to ensure future storm events would not impact downstream properties as a result of the soil disturbance.  If the modeling revealed any negative impact from Pine Gate's activities during the tree felling, Kimley-Horn would design a mitigation plan to return to pre-

existing conditions.  PLAINTIFFS' expert documented the agreed upon Plan of Action and sent the same to Kimley-Horn's engineer to confirm his documentation.  Instead of potential corrections from Kimley-Horn's engineer, PINE GATE's counsel reported the hydrology studies would not be completed.

**D.      Rainfall Causes Sediment Erosion Polluting Downstream Properties**

47.      When flooding occurs, the force and volume of the water increases, causing the stormwater runoff to pick up sediment, including silt, from the disturbed soil.  The fast-moving floodwaters carry sufficient energy to transport and suspend silt particles in the water column.  As the floodwaters recede and slow down, the suspended silt particles settle and deposit, leaving behind layers of silt in the flooded areas.  This stormwater runoff carries bacteria, dissolved minerals, and contaminants on the surface to the downstream properties.  In this case, however, the stormwater polluted PLAINTIFFS' downstream properties with just inches of rainfall.

48.      In daily logs to PINE GATE, the general contractor documented this process.  These logs provide evidence that PINE GATE knew the sediment control measures were insufficient, and the stormwater runoff was leaving the properties encumbered by sediment yet failed to protect the downstream properties.  More specifically, with the first rain even, involving less than one inch of rainfall, the Rio Lago Solar Project experienced stormwater runoff no less than twelve inches deep and floodwaters strong enough to breach the sediment controls—even moving large rocks.

*1.      May 28, 2024*

49.      Beginning the last week of May of 2024, the area in which the Leased Properties were located experienced light rain for several days.  Consistent with the June 2023 Existing Construction Hydrology Report and the March 2024 30% hydrology study provided by Kimley-Horn, significant erosion occurred when the area received approximately two inches of rain on May 28, 2024.

50.     The erosion was readily foreseeable as was the path such erosion would travel.  The hydrology reports in PINE GATE's possession evidenced watersheds or water drainage areas that channeled rainfall and runoff into creeks, streams, and rivers.   Knowing the topography would force the water down the water flow lines directly onto the downstream properties, PINE GATE failed and refused to take steps to protect the downstream properties.

51.     As the June 2023 and the March 2024 hydrology reports predicted, during the May 2028 rain event, stormwater runoff traveled over the disturbed soil and carried the sediment onto downstream properties.

  

52.     The sediment-polluted stormwater runoff traveled directly across the BOGER FAMILY TRUST properties and contaminated two water tanks.  Once perfectly clear water is now murky and filled with silt.   Fish and turtles turned white; and many did not survive.

   

53.     Although PINE GATE was notified of the contamination and provided pictures of the same on June 5, 2024, PINE GATE did not begin investigating the contamination until June 11, 2024. On June 12, 2024, *fifteen days* after the May 28, 2024 rainfall, PINE GATE provided PLAINTIFFS with the general contractor's Daily Logs from May 29, 2024 and June 10, 2024.   The photographs contained in the Daily Logs clearly showed negligent soil-disturbance on the Rio Lago Solar Project and significant tracking of sediment from the Properties onto FM 3240.

54.     Although PINE GATE was notified of the contamination and was in possession of the same, the first time PINE GATE requested permission to see the polluted property was on June 24, 2024—*eighteen days after* PINE GATE was notified of the contamination and *twenty-six days after* PINE GATE was in possession of photographs depicting significant sediment erosion on the project.

55.     After reviewing the May 29, 2024 and June 10, 2024 Daily Logs, PLAINTIFFS requested copies of all Daily Logs showing the implementation of environmental controls and PINE GATE's attempts to address the stormwater runoff.  Although the Rule 11 Agreement required PINE GATE to provide PLAINTIFFS with a copy of all additional environmental/hydrology reports obtained within 48 hours of receipt by PINE GATE, PINE GATE has failed to provide, and refused Plaintiffs' requests to provide, the Daily Logs containing those reports.  PLAINTIFFS obtained some of the Daily Logs from the Monitor; however, many of the Daily Logs still have not been provided to PLAINTIFFS and PINE GATE has refused to comply with the 48-hour requirement.

 

 

56.     Even before PINE GATE finally investigated the damage caused by the May 28, 2024 rainfall, PINE GATE Vice President acknowledged PINE GATE failed to prevent sediment from leaving the Properties and the sediment control measures failed to prevent sediment and silt from leaving the properties and negatively impacting the BOGER FAMILY TRUST Properties.

*2.     July 22, 2024*

57.     On or about July 22, 2024, the area around the Rio Lago Solar Project received approximately six inches of rain.  As previously described, the silt fencing on the Shaw Property channeled the water over the disturbed sediment and carried the polluted water into the natural water stream.     Samples taken from the stormwater runoff leaving the Shaw Property revealed the unmitigated runoff from the Shaw Property had total suspended sediment quantities more than 130 times the stormwater runoff in the natural water flow.

58.     Because of the manner in which sediment travels on top of the water, each time sediment was carried from the Rio Lago Solar Project by the stormwater runoff, significant amount of sediment remained even after the water receded.  Alarmingly, even with a second contamination reaching further into the downstream properties, PINE GATE took no action to protect the downstream properties.

*3.     First Weeks of August and September*

59.     The Rio Lago Solar Project experienced additional rain events the first weeks of August and September 2024.   As the sediment traveled further each time, the number of

contaminated properties increased.  By September 4, 2024, almost all Plaintiffs' properties had damage cause by contaminated stormwater runoff, Doe Creek and Mud Creek were contaminated, and the sediment erosion traveling from the Rio Lago Solar Project was less than one-mile from the Medina River.   Yet, PINE GATE fought every request to protect the downstream properties.

**B.     Monitor Identifies Same Concerns as PLAINTIFFS and PINE GATE Fails to Act**

60.     Pursuant to the Settlement Agreement, David Givler with GEI Engineering (jointly "GEI") was employed as the Monitor.  After weekly inspections of the project, GEI provided the parties with a Construction Site Storm Water Inspection Report ("SWPPP Report") after each inspection.  GEI also provided the parties with a March 2024 SWPPP Manual Review Report and a Kimley-Horn 60% Construction Plans Review Report.

*1.     GEI Construction Site Storm Water Compliance Reports*

a.     June 24, 2024 Report

61.     On or about June 24, 2024, the GEI SWPPP Report identified the following items that required correction action with a deadline of **no later than July 8, 2024**: (1) repair the silt fence discontinuity on the Shaw property; (2) relocate the equipment staging area and extend the silt fence along the construction entrance drive; and (3) seed and cover with erosion control blankets the exposed channel sediment and erosion at and outside the southern corner and northern section of perimeter silt fence on the Shaw property.  PINE GATE failed to implement any of the items identified by GEI by the July 8, 2024 deadline.

b.     July 2, 2024 Report

62.     On or about July 2, 2024, the GEI SWPPP Report identified the following items and provided a deadline of **no later than July 16, 2024**: (1) install construction entrances for North and South Heep sites if delay in TxDOT permitting prevents timely installation in TxDOT right-of-way; and (2) install J-hooks along the northern perimeter of South Heep Site with the proper AASHTO

#57 Stone.  PINE GATE failed to implement any of the items identified by GEI by the July16, 2024 deadline.

        c.    July 11, 2024 Report

63.    On or about July 11, 2024, the GEI SWPPP Report identified numerous incomplete items from the March 2024 Manual Review and provided a deadline of **no later than July 18, 2024**, including, inter alia, PINE GATE's failure to install construction entrances on the Heep Property, insufficient aggregate on the Cox Property, and silt fencing requiring retrenching and re-staking on the Heep Property.  PINE GATE failed to implement all of the Required Mitigation Actions identified by the July 18, 2024 deadline.

        d.    July 17, 2024 Report

64.    On or about July 17, 2024, the GEI SWPPP Report identified numerous defects, and provided a deadline of **no later than July 18, 2024**, including, inter alia, large ruts/void in the Shaw Property construction entrance and on the construction site caused by vehicles and heavy equipment, holes and splitting in the silt fencing, and missing erosion prevention covers.  Once again, PINE GATE failed to implement all of the Required Mitigation Actions identified July 24, 2024 deadline.

      2.    *GEI Reviews*

        a.    July 5, 2024 Review of the 60% Civil Improvement Plans

65.    On or about July 5, 2024, GEI provided a Review of the 60% Civil Improvement Plans (the "60% Plan") for the Rio Lago Solar Construction Site.  The report identified twenty-one areas requiring additional information or action by PINE GATE.   The defects included, inter alia, (1) missing details on the 60% Plan, (2) missing J-hooks (sediment control measures), (3) missing elevation contours, (4) project phases identified in plan sheets did not match project phases, (5) failure to update the Texas Commission on Environmental Quality Notice of Change, (6) questioned tree felling phase by describing it as a "belt and suspenders" approach, and (7) questioned the calculations

supporting the size and design of several sediment and stormwater runoff measures.  PINE GATE responded with generic answers including "to be provided at a later date" and "SWPPP to be updated."  PINE GATE's response to most of the areas identified was that Kimley-Horn would update as part of the IFC ["Issued for Construction" Design Drawings] Package.  In other words, with final drawings months away from completion, PINE GATE intended to continue its activities at the Rio Lago Solar Project without addressing the concerns raised by GEI and with full knowledge that such deficits were likely to cause damages to downstream properties.

66.     Moreover, by failing to respond or provide a deadline for compliance, PINE GATE circumvented the review process.  PLAINTIFFS could not take their concerns to the Review Panel because PINE GATE did not appear to "disagree" with GEI.  The result was PINE GATE continued to disturb the soil in violation of the Temporary Injunction.

67.     Ironically, GEI identified the soil disturbance caused by PINE GATE's construction equipment traveling across wet conditions, causing the existing dirt road to become rutted, and causing equipment to track soil.  PINE GATE's failure to "disagree" with GEI circumvented PLAINTIFFS from invoking the Panel and allowed PINE GATE to continue driving construction vehicles "off road" knowing that such actions were increasing the area of soil disturbance.

        b.     <u>July 8, 2024 Review of the May 2024 SWP3 Manual and other Permits for Rio Lago Solar Project</u>

68.     On or about July 8, 2024, GEI provided a Review of the SWP3 Manual of May 2024 and other Permits for Rio Lago Solar.  GEI noted, inter alia, the absence of several Notices of Intent and permits for various public agencies, the failure to provide sufficient specificity on several sediment control measures, and lack of current scheduling or phasing numbers.  Although the July 8, 2024 did not provide a deadline, the GEI SWPPP Report dated July 11, 2024 required these deficiencies be remedied by July 18, 2024.  Once again, PINE GATE failed to implement all of the Required Mitigation Actions identified by GEI by the July 18, 2024 deadline.

## VII.
### CAUSES OF ACTION

**A.      PINE GATE's Negligence in Failing to Protect the Downstream Properties**

69.      PLAINTIFFS allege and incorporate all facts pled in the preceding paragraphs.

70.      PINE GATE had a duty to exercise reasonable care to avoid a foreseeable risk of injury to others.

71.      PINE GATE breached its duty either by failing to complete or remedy the items identified by GEI by the completion deadlines or by continuing to engage in construction activities in total disregard for the issues identified by GEI.

72.      PINE GATE's breach caused injury to PLAINTIFFS.

73.      PLAINTIFFS seek punitive and exemplary damages based on the negligent acts.

**B.      Trespass**

74.      PLAINTIFFS allege and incorporate all facts pled in the preceding paragraphs.

75.      PLAINTIFFS own real property located adjacent to the Rio Lago Solar Project or in a proximity affected by the construction of the Rio Lago Solar Project.

76.      PINE GATE failed to properly implement the sediment control measures as designed by Kimley-Horn and identified by the Monitor resulted in excessive amounts of water carrying sediments and/or pollutants to physically enter Plaintiffs' properties.

77.      PINE GATE failed to obtain the necessary hydrology reports sufficient to identify the necessary precautions to protect the downstream properties resulted in excessive amounts of sediment and/or pollutants to physically enter PLAINTIFFS' properties.

78.      PINE GATE failed and refused to comply with Texas Water Code section 11.086's prohibition against causing an unlawful diversion of sediment-polluted stormwater runoff onto PLAINTIFFS' Property.

79.     PLAINTIFFS did not authorize the excessive waterflow across its properties or water carrying sediments and/or pollutants to enter its property and more specifically the two water tanks on the BOGER FAMILY TRUST property.

80.     PINE GATE's trespass has caused injury to PLAINTIFFS.

## C.    PINE GATE's Breach of Contract

81.     PLAINTIFFS allege and incorporate all facts pled in the preceding paragraphs.

82.     PINE GATE entered into a valid enforceable contract, specifically the Confidential Settlement Agreement and Release on May 1, 2024.

83.     All conditions precedent were performed or occurred.

84.     On or about May 7, 2024, PINE GATE entered into a Rule 11 Agreement, which incorporated the terms of the May 1, 2024 Confidential Settlement Agreement and Release.

85.     PINE GATE breached the Rule 11 Agreement by failing to provide copies of all environmental and hydrology reports within 48 hours of receipt by PINE GATE to PLAINTIFFS' counsel and expert.

86.     PINE GATE breached the Settlement Agreements by failing to complete or remedy the items identified by GEI by the completion deadlines or by continuing to engage in construction activities in total disregard for the issues identified by GEI.

87.     PINE GATE's breaches caused injury to PLAINTIFFS.

## D.    Violations of the Clean Water Act

88.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant by any person to waters of the United States except in compliance with that section, and, where applicable, a national pollutant discharge elimination system ("NPDES") permit issued by EPA or an authorized state pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

89.     The Texas Water Code provides that no person may discharge sewage, municipal waste, recreational waste, agricultural waste, or industrial waste into or adjacent to any water in the state, except as authorized by TCEQ. Texas Water Code § 26.121(a)(1).

90.     Section 502(12) of the CWA, 33 U.S.C. § 1362(12), defines the term "discharge of pollutants" as any addition of any pollutant to navigable waters from any point source.

91.     Section 502(6) of the CWA, 33 U.S.C. § 1362(6), defines the term "pollutant" to include sewage, sewage sludge, biological materials, and municipal waste.

92.     Pursuant to Section 26.001(13) of the Texas Water Code, the term "pollutant" includes sewage.

93.     Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines the term "point source" as any discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, or conduit from which pollutants are or may be discharged.

94.     Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines the term "navigable waters" as the waters of the United States, including the territorial seas.

95.     Pursuant to Section 26.001(5) of the Texas Water Code, water in the state includes groundwater, percolating or otherwise, lakes, bays, ponds, impounding reservoirs, springs, rivers, streams, creeks, estuaries, wetlands, marshes, inlets, canals, the Gulf of Mexico, inside the territorial limits of the state, and all other bodies of surface water, natural or artificial, inland or coastal, fresh or salt, navigable or non-navigable, and including the beds and banks of all watercourses and bodies of surface water, that are wholly or partially inside or bordering the state or inside the jurisdiction of the state.

96.     Section 402 of the CWA, 33 U.S.C. § 1342, provides that the permit-issuing authority may issue an NPDES permit (or State equivalent) authorizing the discharge of pollutants, upon condition that such discharge will meet all applicable requirements under specified sections of the

Act or such conditions that the Administrator determines are necessary to carry out the provisions of the Act, and subject to other conditions that the Administrator deems appropriate to assure compliance with those requirements.

97.     Under Section 402(b) of the CWA, 33 U.S.C. § 1342(b), EPA may approve a state to administer its own permit program. Pursuant to Section 402(b), Texas was granted NPDES permitting authority within the jurisdictional boundaries of Texas on September 14, 1998. Accordingly, by and through TCEQ, Texas issues TPDES permits authorizing the discharge of waste or pollutants into or adjacent to water in the state, pursuant to Section 26.027 of the Texas Water Code.

98.     Section 309(b) of the CWA, 33 U.S.C. § 1319(b), authorizes the EPA Administrator to commence a civil action for appropriate relief, including a permanent or temporary injunction, when any person is in violation of Section 301 of the CWA, 33 U.S.C. § 1311, or a permit condition or limitation in a permit issued by a state under Section 402 of the CWA, 33 U.S.C. § 1342.

99.     Section 7.101 of the Texas Water Code states that no person may cause, suffer, allow, or permit any violation of a statute within TCEQ jurisdiction or a rule adopted or an order or permit issued under such statute.

100.    Pursuant to Section 7.102 of the Texas Water Code, any person who causes, suffers, allows, or permits a violation of a statute, rule, order, or permit shall be assessed for each violation a civil penalty not less than $50 nor greater than $25,000 for each day of each violation as the court or jury considers proper.

101.    Section 7.102 of the Texas Water Code further specifies that each day of a continuing violation is a separate violation. Section 7.108 of the Texas Water Code authorizes Texas to recover its reasonable attorney's fees, court costs, and reasonable investigative costs if it prevails in a suit under Chapter 7, Subchapter D (Sections 7.101 – 7.111) of the Texas Water Code.

102.    PINE GATE is currently operating pursuant to TPDES permit TXR150000.   The permit was issued on January 16, 2024.

103.    The TPDES permit allows the discharge of wastewater from the Rio Lago Solar Project only in accordance with limitations, monitoring requirements, and other conditions set forth in each permit and in accordance with TCEQ orders, permits, and Texas Laws.

104.    Pursuant to the terms and conditions of the TPDES permit, Plaintiffs reported to TCEQ on numerous occasions when waterflow limitations were exceeded from the Rio Lago Solar Project.

105.    On multiple occasions, PINE GATE discharged contaminated stormwater runoff onto Plaintiffs' properties.

106.    Unless restrained by ordered of this Court, PINE GATE will continue to violate the TPDES permit.

107.    As a result of its violations, PINE GATE is subject to both injunction relief, pursuant to section 309(b) of the CWA, 33 U.S.C. § 1319(b), and civil penalties, pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d).

108.    As relevant to the claims of Texas, Section 7.101 of the Texas Water Code states that no person may cause, suffer, allow, or permit a violation of a permit issued under TCEQ's jurisdiction. As relevant to the claims of Texas, Section 7.102 of the Texas Water Code provides that any person who causes, suffers, allows, or permits a violation of a statute, rule, order, or permit shall be assessed for each violation a civil penalty not less than $50 nor greater than$25,000 for each day of each violation as the court or jury considers proper. Section 7.102 of the Texas Water Code further specifies that each day of a continuing violation is a separate violation.

109.     As relevant to the claims of Texas, Section 7.032 of the Texas Water Code authorizes the Court to issue a permanent or temporary injunction to require compliance with the Texas Water Code when a person violates a provision of a TCEQ rule or permit.

**VIII.**
**ATTORNEY'S FEES**

110.     PLAINTIFFS are entitled to recover attorney's fees under section 38.002 of the Texas Civil Practice and Remedies Code for its breach of contract claim and pursuant to section 7 of the Texas Water Code.

**IX.**
**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiffs ANDREW AND EUNICE BOGER, AS TRUSTEES OF BOGER FAMILY TRUST, JULIE A. MILLS, PATTI LYNN WIATREK F/K/A PATTI LYNN BROWN, O'BANYON WOOTSEN CUSTER AND NATALIE CHRISTINE CUSTER, BRYAN NEFF & LAURIE NEFF, LORETTA NEUMANN, NEVELS PROPERTIES, LLC, AND LUKE SCHILHAB AND ALLISON SCHILHAB pray for the following relief:

(a)      Actual and compensatory damages;

(b)      Punitive and exemplary damages;

(c)      Attorney's fees;

(d)      Costs of suit; and

(e)      Such other and further relief to which Plaintiffs may be justly entitled.

Respectfully submitted,

**ROSENBLATT LAW FIRM**
16731 Huebner Road
San Antonio, Texas 78248
Telephone: (210) 562-2900
Facsimile:   (210) 562-2929

By: */s/ Jennifer B. Rosenblatt*
 Jennifer B. Rosenblatt
 State Bar No. 00788321
 Jennifer@ROSENBLATTLAWFIRM.com
 Nicole E. Jackson
 State Bar No. 24048178
 Nicole@ROSENBLATTLAWFIRM.com
 Elena P. Serna
 State Bar No. 24072335
 Elena@ROSENBLATTLAWFIRM.com

 ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that, on September 12, 2024, a true and correct copy of the above and foregoing document was served via e-service on all parties in accordance with the Federal Rules of Civil Procedure.

*/s/ Jennifer B. Rosenblatt*
Jennifer B. Rosenblatt