IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| ANDY GARCIA, JULIE A MILLS, PATTI LYNN WIATREK, O'BANYON WOOTSEN CUSTER, NATALIE CHRISTINE CUSTER, BRYAN NEFF, LAURIE NEFF, LORETTA NEUMANN, NEVELS PROPERTIES, LLC, LUKE SCHILHAB, ALLISON SCHILHAB, ANDREW BOGER, EUNICE BOGER, <br><br>*Plaintiffs,* <br><br>vs. <br><br>SARAH ANN SHAW, AS TRUSTEE OF THE SHAD C. SHAW FAMILY TRUST; DAVID EUGENE HEEP, PINE GATE RENEWABLES, LLC, RIO LAGO SOLAR, LLC, BARBARA LYNN MAZUREK, AS TRUSTEE OF THE ROBERT HOWARD MAZUREK 2011 FAMILY TRUST; AND JOHN DAVID COX, <br><br>*Defendants.* | 5-24-CV-00851-OLG-RBF |

## ORDER DENYING MOTION TO COMPEL ARBITRATION

Before the Court is Defendants' Motion to Compel Arbitration and Stay Proceedings. Dkt. No. 10. The District Court referred all pretrial matters for resolution, pursuant to Rules CV-72 and 1 of Appendix C of the Local Rules of the United States District Court for the Western District of Texas. *See* Dkt. No. 16. For the reasons discussed below, in the parties' briefing, and at the hearing held October 11, 2024, Defendants' Motion to Compel Arbitration, Dkt. No. 10, is **DENIED**.

### Factual and Procedural Background

This case involves a dispute among several land users in Bandera County. Defendants Pine Gate Renewables, LLC and Rio Lago Solar, LLC (collectively referred to herein as "Pine

Gate") are utility companies endeavoring to construct "a solar energy generating facility or solar farm" (the "Rio Lago Solar Project")" on four properties in Bandera County leased from Sarah Ann Shaw, as Trustee of The Shad C. Shaw Family Trust; David Eugene Heep; Barbara Lynn Mazurek, as Trustee of The Robert Howard Mazurek 2011 Family Trust; and John David Cox (these properties are referred to herein as the "Leased Properties"). Dkt. No. 57. (Pls.' 7th Am. Compl.) ¶ 13. Plaintiffs own land near the Leased Properties. *Id*. ¶ 14.

Plaintiffs initially sued in state court. Plaintiffs received, on December 23, 2023, a temporary restraining order pausing several components of the Rio Lago Solar Project. The state court paused the project based on concerns about damage to Plaintiffs' adjacent and nearby properties caused by the project's construction. *See* Dkt. No. 1 (Notice of Removal) ¶ 20; *see also* Dkt. No. 8 Doc. 1 (Pls.' Orig. Pet.). On February 7, 2024, the state trial court entered a temporary injunction that enjoined Pine Gate "from timbering or felling trees on the leased properties, along with other activities related to clearing, grading, or preparing the land in preparation for the solar farm" unless Pine Gate complied with several specific requirements. Dkt. No. 1 ¶ 22.

Several disputes over whether and how Pine Gate followed these requirements and potential violations of the injunctive order followed. On April 4, 2024, the parties participated in a court-ordered mediation, and on May 1, 2024, they executed the "Settlement Agreement." Pls.' 7th Am. Compl. ¶¶ 35-36; Dkt. No. 54 Ex. 1 ("Settlement Agreement"). The parties entered into a Texas Rule of Civil Procedure Rule 11 Agreement on May 7, 2024 "to supplement and modify the Settlement Agreement." Pls.' 7th Am. Compl. ¶ 39; Dkt. No. 53 Ex. 2 ("Rule 11 Agreement").

Defendants removed the case on diversity grounds in August 2024. Soon after removal and prior to filing any other pleadings or motions, Defendants filed a Motion to Compel Arbitration, arguing that the Settlement Agreement's arbitration provision covers Plaintiffs' claims and compels them to arbitration. Dkt. No. 10 (Mot.).

Plaintiffs' live complaint includes several causes of action pertaining to alleged damage incurred on their properties due to storm water runoff from Defendants' project activities occurring on the Leased Properties. These causes of action include trespass, negligence, and breach of contract related to alleged non-compliance with the Settlement Agreement and Rule 11 Agreement. *See* Pls.' 7th Am. Compl. Defendants argue that Plaintiffs released the claims via the Settlement Agreement and that the claims nonetheless must be compelled to arbitration. Dkt. No. 64 (Answer to Pls.' 7th Am. Compl.) ("Answer"). Defendants also counterclaimed for breach of contract, arguing that Plaintiffs breached the Settlement Agreement by bringing released claims to court. *Id*.

## Legal Standard

The Fifth Circuit has established a two-step inquiry for determining whether parties have agreed to arbitrate a claim. The first step looks into "contract formation—whether the parties entered into *any arbitration agreement at all*. The second [step] involves contract interpretation to determine whether *this* claim is," or any other claims at issue are, "covered by the arbitration agreement." *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016) (emphasis in original). In the absence of a valid clause delegating the threshold issue of arbitrability to the arbitrator, both steps are questions for the Court. *Id.* Where the parties' contract delegates the question of arbitrability to the arbitrator, however, a court lacks authority to decide whether the parties' dispute falls within the scope of the agreement. *Henry Schein, Inc. v. Archer & White*

3

*Sales, Inc.*, 586 U.S. 63, 67-69 (2019). To determine whether a claim falls within an arbitration clause's scope, courts apply state rules of contract interpretation. *Signal Ridge Owners Ass'n, Inc. v. Landmark Am. Ins. Co.*, 657 F. Supp. 3d 866, 873 (N.D. Tex. 2023). Courts look to the facts of the case and not the causes of action asserted. *Hou-Scape, Inc. v. Lloyd*, 945 S.W.2d 202, 205 (Tex. App.—Houston [1st Dist.] 1997, orig. proceeding).

## Analysis

The parties share some common ground, at least initially. They agree that the Settlement Agreement is valid and enforceable, resolving the first issue in the Fifth Circuit's two-step test. *See* Dkt. No. 54 (Defs.' Br. in Supp. of Mot. To Compel Arbitration) ("Defs.' Br.") at 1 ("Neither Plaintiffs nor Defendants dispute that the Settlement Agreement is a valid and binding contract."). And they also agree that the question of arbitrability is a question for the Court. They part ways, however, "over the scope of the release and ADR Process in the Settlement Agreement," although they agree that "interpretation of the Settlement Agreement's terms is a question of law for the Court." *Id.* at 4.

### A.  Property-Damage Claims are not Covered by the Arbitration Provision.

State contract law governs interpretation of the scope of an agreement to arbitrate. *Tittle v. Enron Corp.,* 463 F.3d 410, 419 (5th Cir. 2006). ("Determining the scope of an arbitration agreement involves applying state rules of contract interpretation."). "Under Texas law, a court construing a contract must read that contract in a manner that confers meaning to all of its terms, rendering the contract's terms consistent with one another." *Id*. The primary object of contract interpretation under Texas law "is to ascertain and give effect to the intent of the parties as that intent is expressed in the contract." *Papalote Creek II, L.L.C. v. Lower Colorado River Auth.*, 918 F.3d 450, 454 (5th Cir. 2019) *citing Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006). The contract should be considered as a whole, so that no provision

4

is rendered meaningless, and no provision is given singular control of the instrument. *Tittle,* 463 F.3d at 419.

        **1.**     *Property-damage claims fall outside the scope of the arbitration provision.*

The arbitration provision in the Settlement Agreement provides for a monitor to resolve a limited range of disputes by ensuring compliance with regulatory requirements. The agreement, therefore, might more properly be labelled a "provision in aid of alternate dispute resolution for certain regulatory disputes"; it is not an agreement that clearly sends certain classes or categories of claims to be resolved exclusively in arbitration, as is more typical of provisions labelled, "arbitration provision." And nothing in the agreement's provisions on the monitor contemplate a monitor charged exclusively with reviewing property-damage claims. The provision instead addresses, as follows, the Storm Water Pollution Prevention Plan (SWPPP) that lies at the heart of the Settlement Agreement's resolution of concerns over storm water runoff:

> o  The scope of the Monitor's role will be:
>   - To review and, if necessary in the Monitor's opinion, recommend revisions to the SWPPP for the Project at the 60% design stage;
>   - To inspect the Project site as necessary in the Monitor's opinion with respect to SWPPP and other regulatory compliance;
>   - The Monitor may provide counsel and/or experts any documents the Monitor believes are relevant to the Monitor's opinion;
>   - To communicate with Plaintiffs regarding the status of the Project's regulatory compliance; and
>   - To review and, if necessary in the Monitor's opinion, recommend corrective action for any SWPPP or regulatory compliance issues identified by Monitor.

*See* Settlement Agreement § III.B. These and other similar provisions make clear that the parties did not envision a monitor to sit in exclusive review of property-damage claims, nor that the monitor's decisions would necessarily preclude future claims for property damage. *See id.*

(describing the monitor as a "Texas-licensed civil engineer" appointed to be a "regulatory compliance monitor"). This is further demonstrated in the "Scope of Work" described in the Monitor Agreement provided by Givler Engineering, Inc. when contracting the Monitor. *See* Defs.' Br. Ex. 2 (Monitor Agreement).

The text of the Settlement Agreement belies Defendants' argument that Plaintiffs' current claims, related to property damage from runoff, are barred "because the Monitor and Panel have been vested with jurisdiction over these issues." Answer ¶ 123. Indeed, no language in the Settlement Agreement directly supports this assertion, a point Defendants appear to concede. *See* Defs.' Br. at 22 ("Pursuant to the terms of the Settlement Agreement and the Monitor Agreement, the Monitor/Dispute Resolution Panel are, *in essence*, the 'arbitrators' of the current disputes between Plaintiffs and Rio Lago." (emphasis added)). Rather, per the Settlement Agreement language, the parties vested the Monitor with authority to make recommendations based on regulations. *See* Settlement Agreement § III.B.

Reaching Defendants' interpretation of the arbitration provision would require rewriting it. Even the provision cited by Defendants, which addresses the Creation of a Review Panel, provides only that the Review Panel has jurisdiction over appeals from decisions by the Monitor.

> Pursuant to the Settlement Agreement, a Party may appeal a decision of the Monitor to a Review Panel, which shall consist of three Texas licensed engineers with five years' experience in Bandera County or a county contiguous to Bandera County. Any majority decision by the Review Panel is final and binding on all Parties.

Settlement Agreement, Monitor Engagement, cited by Defendants in Answer ¶ 123.

      **2.**    *The Settlement Agreement's releases exempt property-damage claims*. The Settlement Agreement contains a carveout provision for future claims of personal injury or property damage.

> **VIII. RELEASES & COVENANTS**
>
> A. <u>Plaintiffs' Releases:</u> Except for rights under the Mediation Agreement and this Settlement Agreement, Plaintiffs hereby **settle, release, and waive**:
>
> 1. all current claims, liens, demands, causes of action, obligations, damages (including without limitation actual, consequential, and punitive damages), and liabilities of any kind, known or unknown, legal and equitable, that Plaintiffs have against Defendants that are in any way related to the Project, including but not limited to any and every legal or equitable claim Plaintiffs asserted in the Lawsuit and the Petitions, as well as all relief provided for in the Injunction Orders and the Enforcement Order, and all claims for attorneys' and/or expert fees;
>
> 2. all future claims, liens, demands, causes of action, obligations, damages (including without limitation actual, consequential, and punitive damages), and liabilities of any kind, known or unknown, legal or equitable, that Plaintiffs may have against Defendants that are in any way related to the Project, including but not limited to any and every legal or equitable claim Plaintiffs asserted in the Lawsuit and the Petitions, as well as all relief provided for in the Injunction Orders and the Enforcement Order, and all claims for attorneys' and/or expert fees;
>
> 3. provided, however, that the release in subsection 2. above does not apply to any future claims for personal injury or property damage.

Settlement Agreement (VIII)(A)(3).

The release, by its plain terms, entitles plaintiffs to sue for *any* claims seeking recovery for property damage. This provision, read in conjunction with the provisions on the Monitor and Review Panel, plainly exempts property-damage claims from the ADR process contemplated by the Settlement Agreement. The carveout doesn't limit the type of claim; it broadly exempts from the release any and all claims for property damage. And reading the provision broadly as it is written doesn't render the release illusory or otherwise read it out of the agreement, as Defendants contend. Even read broadly, and in line with its plain terms, the release still forecloses, for example, claims brought by plaintiffs on behalf of public interests or for harms other than actual damages to a plaintiff's property (or personal injury).

Seeking a narrow reading of the carveout and a broad reading of the arbitration provision, Defendants invoke a provision ("Provision H") that indicates that the goal of the Settlement

Agreement was to resolve claims outside of court. Dkt. No. 54 at 13, citing Settlement Agreement (II)(H):

> H. To avoid the costs and uncertainties of litigation, the Parties desire to settle their differences with each other regarding any and all claims arising out of, related to, or in any manner involving the Lawsuit, the Petitions, the Counterclaims, the Injunction Orders, the Enforcement Order, and the Injunction Appeal, pursuant to the terms provided in this Settlement Agreement. The Parties are entering into this Settlement Agreement to provide, in consideration for the promises and covenants contained herein, for the full and final compromise, settlement, release, and discharge (as defined by the scope of the releases herein) of Plaintiffs' claims against Defendants, Defendants' claims against the Plaintiffs, and Solar Defendants' Counterclaims against the Counter-Defendants.

But this somewhat vague precatory provision must yield to the more specific language in the carveout and Monitor provisions. *See Claimant ID 100218776 v. BP Expl. & Prod., Inc.*, 712 Fed. Appx. 372, 375 (5th Cir. 2017) ("[W]here a general provision and a narrow, specific provision overlap and the specific provision fits the facts at hand, the specific provision controls. This prevents the general provision from swallowing the specific, and it gives effect to every clause in a contract."). Moreover, as mentioned, giving effect to the carveout's plain language by allowing all claims for property damage does not necessarily create a contradiction with other similarly specific provisions in the agreement or even with Provision H. In short, there is nothing necessarily contradictory between a "desire" to resolve all claims and disputes and a release that sends some claims to ADR and forecloses their resolution in litigation while at the same time allowing a limited subset of claims to proceed through a litigated resolution.

### B. The Breach-of-Contract Claims Are Not Covered by the Arbitration Provision.

Plaintiffs' claims alleging a breach of the Settlement Agreement due to Defendants' alleged failure to follow the agreement's ADR procedures are not somehow themselves subject to the arbitration provision. Indeed, if such claims were sent (again) to ADR, Plaintiffs would be

stuck in a kind of recursive ADR loop wherein they could never obtain compliance with the Settlement Agreement's terms.

Moreover, the Settlement Agreement doesn't contemplate this kind of never-ending story. And "a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *Tittle*, 463 F.3d at 421 (citing *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582 (1960)). Thus, "[a]lthough both federal law and Texas law create a presumption in favor of arbitrability, unambiguous language controls when the question is the scope of an arbitrator's power, and the policy that favors resolving doubts in favor of arbitration cannot serve to stretch a contractual clause beyond the scope intended by the parties." *Papalote Creek II, L.L.C.* 918 F.3d at 455. "If [parties] limit arbitration to a specific category of disputes, at the exclusion of other categories of disputes, then the arbitrator's power is limited to those disputes to which the parties expressly consented." *Id.* at 456.

Here, the parties did not agree to submit breach-of-contract issues to the Monitor or the Review Panel. As mentioned, the monitor's role as outlined in the agreement is to ensure regulatory compliance; nothing in the Agreement contemplates that the monitor would then also re-monitor alleged failures to adhere to the Monitor's and the Panel's decisions. So too with the Review Panel, which the parties' agreement charged with reviewing the monitor's decisions when disputed by the parties, but not with reviewing the parties' compliance, or lack thereof, with the monitor's decisions:

> B. **Scope of the Panel's Role:** The scope of the Panel's role will be to review the recommendations of the Monitor following a Party's request for such a review and, based on a majority vote, to affirm, reject, or modify the disputed recommendations of the Monitor. The decision of the Panel shall be binding upon the Parties. In the event that the Panel fails to act or reach a decision on a dispute presented to it, the recommendations of the Monitor shall be final and binding upon the Parties.

Settlement Agreement § IV.B.

Neither the panel or the monitor is tasked by the parties' agreement with considering non-performance challenges or challenges to the contract requiring contract interpretation. In *Papalote Creek*, the Fifth Circuit aptly stated that "if the arbitration clause limits arbitration to performance-related disputes, then the arbitrator cannot decide other matters, such as interpretative disputes." *Papalote Creek II, L.L.C.* 918 F.3d at 455. *See also Negrin v. Kalina, No. 09-Civ-6234*, 2010 WL 2816809, at *6 (S.D.N.Y. July 15, 2010) (holding that "[t]he arbitration clause cover[ing] disputes relating to 'non-performance' " did not apply when there was no allegation that "[d]efendants failed to discharge ... any obligation under the [contract]").

Here, Plaintiffs lodge contract claims alleging a breach of the Settlement Agreement due to Defendants' failure to engage in the agreed-upon ADR process by refusing or failing to comply with binding recommendations made by the monitor, and by not submitting their substantive disagreements with the monitor's decisions to the panel. Tr. 10/10/24 at 70. Such contract claims are not contemplated in the ADR provisions of the parties' agreements, or in the scope of the Monitor or Panel's role. The possibility that the Monitor or the Panel would take on an interpretative role as may be required to resolve these claims is further outside the realm of the agreement. Accordingly, the breach-of-contract claims brought by Plaintiffs are not themselves subject to the ADR provisions outlined the parties' agreement, and neither is the interpretation of these claims. *See Negrin*, 2010 WL 2816809 at *5 ("The parties' use of precise language in the arbitration clause suggests an intent to limit arbitration to a particular subset of disputes."); *Papalote Creek II, L.L.C.* 918 F.3d 450 (holding that interpretive disputes were excluded from review by Arbitrators assigned to review performance disputes).

**Conclusion**

For the reasons discussed above, the Motion to Compel Arbitration, Dkt. No. 10, is **DENIED**.

SIGNED this 4th day of February, 2025.

_____
RICHARD B. FARRER
UNITED STATES MAGISTRATE JUDGE